## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FILED**

**SEP 1 3 2010**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| IN RE PETITION OF | ) |
| | ) |
| STANLEY KUTLER | ) |
| 4112 Keewatin Trail | ) |
| Verona, Wisconsin 53593; | ) |
| | ) |
| AMERICAN HISTORICAL ASSOCIATION | ) |
| 400 A Street SE | ) |
| Washington, District of Columbia 20003; | ) |
| | ) |
| AMERICAN SOCIETY FOR LEGAL HISTORY | ) Miscellaneous Action No. |
| 4301 Friedmann Hall | ) |
| Western Michigan University | ) |
| Kalamazoo, Michigan 49008; | ) |
| | ) |
| ORGANIZATION OF AMERICAN HISTORIANS | ) |
| 112 North Bryan Avenue | ) Case: 1:10-mc-00547 |
| Bloomington, Indiana 47408; | ) Assigned To : Lamberth, Royce C. |
| | ) Assign. Date : 9/13/2010 |
| and | ) Description: miscellaneous |
| | ) |
| SOCIETY OF AMERICAN ARCHIVISTS | ) |
| 17 North State Street, Suite 1425 | ) |
| Chicago, Illinois 60602. | ) |

---

## PETITION FOR ORDER DIRECTING RELEASE OF
## TRANSCRIPT OF RICHARD M. NIXON'S GRAND JURY TESTIMONY OF
## JUNE 23-24, 1975, AND ASSOCIATED MATERIALS OF
## THE WATERGATE SPECIAL PROSECUTION FORCE

Stanley Kutler, the American Historical Association, American Society for Legal History,

Organization of American Historians, and Society of American Archivists hereby petition this Court

to exercise its inherent supervisory authority to unseal the transcript of President Richard M. Nixon's

grand jury testimony of June 23-24, 1975, and certain associated materials of the Watergate Special

Prosecution Force. Attached to this petition is a list of the records that petitioners seek. The records

are located at the National Archives and Records Administration in College Park, Maryland, as part



1

of Record Group 460, Records of the Watergate Special Prosecution Force, Special Prosecutor's Files, Records Relating to Richard Nixon.

1.      Stanley Kutler is an historian, Professor Emeritus at the University of Wisconsin, and author of *The Wars of Watergate* (1990), a text that is widely considered to be the definitive account of the Watergate scandal. The American Historical Association, American Society for Legal History, and Organization of American Historians are professional organizations for historians. The Society of American Archivists is a national archival professional association.

2.      In June 1975, less than one year after he resigned the presidency, Richard Nixon testified before two members of a Washington, DC-based federal grand jury and several staff attorneys of the Watergate Special Prosecution Force. The testimony was taken by deposition near Mr. Nixon's home in San Clemente, California. Never before had a former president given grand jury testimony, and never before had a court authorized a select number of grand jurors to travel outside their jurisdiction to take testimony. Mr. Nixon's testimony capped what one newspaper described as "the most momentous criminal investigation in American political history." Editorial, *Mr. Nixon's Testimony*, N.Y. Times, June 29, 1975, at 14.

3.      At minimum, the testimony covered the following topics in connection with the special prosecutor's Watergate investigation: the 18½-minute gap on a White House tape recording of a June 20, 1972 conversation between Mr. Nixon and Chief of Staff H.R. Haldeman; the alteration of White House tape transcripts that were submitted to the House Judiciary Committee during its impeachment inquiry; the extent to which the Nixon administration used the IRS to harass Mr. Nixon's political enemies; and the $100,000 campaign contribution from billionaire Howard Hughes to Mr. Nixon's close friend Charles G. "Bebe" Rebozo. In addition, one news report suggests that

Mr. Nixon was asked who ordered questionable "national security" wiretaps of journalists and government officials between 1969 and 1971.

4.     Watergate arguably was the defining episode of Mr. Nixon's presidency. "Watergate" has come to symbolize a variety of unlawful activities associated with the Nixon White House, including the misuse of federal agencies, improper campaign activities, and obstruction of justice. As political history, Watergate is the benchmark political scandal against which all others are measured. As legal history, Watergate generated Supreme Court precedent regarding presidential power and the relationship between the branches of government. As social and cultural history, Watergate is a shibboleth that invokes corruption and distrust of government.

5.     Today, Watergate continues to captivate historians and the public alike. Despite the many books, films, plays, and television programs that have addressed the scandal and its players, unanswered questions remain. New theories and revised narratives are proposed. Mr. Nixon's grand jury testimony continues to be a source of speculation for Nixon scholars and others.

6.     This petition seeks the release of the transcript of Mr. Nixon's grand jury testimony of June 23-24, 1975, the deposition exhibits, and memoranda regarding and correspondence with Mr. Nixon's lawyer. Submitted in support of this petition is a comprehensive declaration by historian Stanley I. Kutler that recounts the key events surrounding Watergate, describes efforts to preserve and make public the Nixon tapes, describes the extensive publicity that the Watergate scandal received at the time it occurred and in the decades since the events transpired, and refers to some of the revisionist history theories that have arisen. A declaration by Julian Helisek, a fellow at Public Citizen Litigation Group, outlines what is publicly known about Mr. Nixon's grand jury testimony,

reviews the investigations of the three Watergate grand juries, and identifies grand jury testimony previously made public.

7.  Also submitted in support of this petition are declarations from Nixon and Watergate scholars who strongly support release of the grand jury records. These scholars include Rutgers University Professor David Greenberg, Distinguished Professor of History Emeritus at Wayne State University Melvin Small, University of Maryland Professor Keith Olson, and historian Rick Perlstein.

8.  This petition is also supported by author and former White House Counsel John W. Dean III, former Assistant Chief Counsel to the Senate Watergate Committee David Dorsen, Editor of the Nieman Watchdog Project at Harvard University's Nieman Foundation for Journalism and former District of Columbia Editor of the *Washington Post* Barry Sussman, Associate Professor of Media and Public Affairs at The George Washington University Mark Feldstein, Professor of History and Public Affairs at the Woodrow Wilson School of Public and International Affairs at Princeton University Julian Zelizer, Assistant Professor of History at California State University (San Bernardino) Thomas Long, Nixon Tapes Project Editor with the Presidential Recordings Project at the University of Virginia's Miller Center for Public Affairs Kenneth J. Hughes, Watergate journalist Don Fulsom, former Historian of the U.S. House of Representatives and current Director of the Robert C. Byrd Center for Legislative Studies Raymond Smock, and former assistant special prosecutor with the Watergate Special Prosecution Force Richard J. Davis.

WHEREFORE, petitioners respectfully request that this Court order the release of the transcript of Richard M. Nixon's grand jury testimony of June 23-24, 1975, and associated materials of the Watergate Special Prosecution Force.

Dated: September 8, 2010

Respectfully submitted,

Allison M. Zieve (D.C. Bar No. 424786)
Michael T. Kirkpatrick (D.C. Bar No. 486293
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Counsel for Petitioners

*Records Relating to President Nixon's Grand Jury Deposition*
(located in RG 460, Watergate Special Prosecution Force,
Special Prosecutor's Files, Records Relating to Richard Nixon)

**Box 5**

Folder 9/5: Richard J. Davis File: WSPF memos & correspondence with Herbert Miller

Folder 9/11: List of remaining documents re RMN deposition

Folder 9/13: #2 Correspondence & memos re contacts with Miller

Folder 9/14: #3 Exhibits furnished to Miller-mostly used in deposition

Folder 9/15: #4 Background documents

Folder 9/16: Transcripts, 2 days

**Box 6**

Folder 9/21: Binder #1-Summaries of tapes (or possibly of HRH notes)

Folder 9/22: Binder #2-Tape transcripts

Folder 9/23: Binder #3-Tape transcripts

**Box 7**

Folder 9/24: Exhibits

Folder 9/25: Exhibits

Folder 9/26: Exhibits

Stenographer's tape of deposition

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE PETITION OF STANLEY KUTLER,   )
AMERICAN HISTORICAL ASSOCIATION,   )
AMERICAN SOCIETY FOR LEGAL HISTORY,   )  Miscellaneous Action No.
ORGANIZATION OF AMERICAN HISTORIANS, )
and SOCIETY OF AMERICAN ARCHIVISTS.   )
_____ )

## MEMORANDUM IN SUPPORT OF PETITION FOR ORDER DIRECTING RELEASE OF TRANSCRIPT OF RICHARD M. NIXON'S GRAND JURY TESTIMONY OF JUNE 23-24, 1975, AND ASSOCIATED MATERIALS OF THE WATERGATE SPECIAL PROSECUTION FORCE

Professor Stanley Kutler, the American Historical Association, the American Society for Legal History, the Organization of American Historians, and the Society of American Archivists petition this Court for an order directing the release of President Richard M. Nixon's thirty-five-year-old grand jury testimony and associated materials of the Watergate Special Prosecution Force.[1] On June 23-24, 1975, President Nixon testified before two members of a federal grand jury who traveled from Washington, DC, to San Clemente, California. The testimony was then presented in Washington, DC, to the full grand jury that had been convened to investigate political espionage, illegal campaign contributions, and other wrongdoing falling under the umbrella term Watergate.

Watergate was the defining event of Richard Nixon's presidency. In the early 1970s, as the Vietnam War raged and the civil rights movement in the United States continued its momentum, the Watergate scandal ignited a crisis of confidence in government leadership and a constitutional crisis that tested the limits of executive power and the mettle of the democratic process. "Watergate" was

---

[1] A list of the records that petitioners seek is attached to the Petition, filed concurrently herewith. The records are located at the National Archives and Records Administration in College Park, Maryland, as part of Record Group 460, Records of the Watergate Special Prosecution Force, Special Prosecutor's Files, Records Relating to Richard Nixon.

more than a break-in and cover-up; the word connotes illicit campaign financing, unauthorized governmental surveillance, and misuse of federal agencies. Watergate also lionized American investigative journalism. And it sparked important government reforms to curb secrecy and corruption: The scandal prompted Congress to create the Federal Election Commission and to enact the Ethics in Government Act, the Foreign Intelligence Surveillance Act, the Presidential Recordings and Materials Preservation Act, and the Presidential Records Act.

Watergate is the most closely scrutinized political scandal in American history. Throughout the more than thirty-five years since the events unfolded, Watergate has continued to fascinate scholars and the public alike, as evidenced by the continuing stream of new works on the topic by the academic community and the popular media.[2] Yet despite the years of study and discussion, President Nixon's knowledge of the events and role in the cover-up remain a subject of speculation for historians, journalists, and others.

Mr. Nixon's grand jury testimony addressed questions including: What did he and Chief of Staff H.R. Haldeman discuss on the 18½ minutes of erased White House tape recording made three days after the Watergate break-in and who was responsible for its erasure? To what extent was President Nixon involved in the White House's decision to alter transcripts of tape recordings that

---

[2]A sample of the works that have been produced since 2007 alone include Richard Ben-Veniste, *The Emperor's New Clothes: Exposing the Truth from Watergate to 9/11* (2010); Donald Farinacci, *When One Stood Alone: John J. Sirica's Battle Against the Watergate Conspiracy: A Tale of Moral Courage* (2009); Mark Avrom Feldstein, *Poisoning the Press: Richard Nixon, Jack Anderson, and the Rise of Washington's Scandal Culture* (forthcoming 2010); *Frost/Nixon* (Universal Pictures 2008) (film); L. Patrick Gray III and Ed Gray, *In Nixon's Web: A Year in the Crosshairs of Watergate* (2008); E. Howard Hunt and Greg Aunapu, *American Spy: My Secret History in the CIA, Watergate and Beyond* (2007); Jon Marshall and Bob Woodward, *Watergate's Legacy and the Press: The Investigative Impulse* (forthcoming 2011); William H. Merrill, *Watergate Prosecutor* (2008); James Rosen, *The Strong Man: John Mitchell and the Secrets of Watergate* (2008).

were turned over to the House Judiciary Committee during its impeachment inquiry? To what extent did the Nixon administration use the Internal Revenue Service (IRS) to harass Mr. Nixon's political enemies? What is the complete story regarding the $100,000 campaign contribution from billionaire Howard Hughes to President Nixon's close friend Charles G. "Bebe" Rebozo? Releasing the testimony will help historians still seeking answers to these and potentially other important questions about Mr. Nixon's presidency better to understand the events and the man.

As the declarations submitted in support of the petition demonstrate, and as this memorandum spells out more fully below, the historical interest in Watergate in general—and in particular President Nixon's role in it—justifies the release of the records sought here. *See In re Petition of Craig*, 131 F.3d 99, 105 (2d Cir. 1997) (historical interest may justify release of grand jury records). A powerful public and scholarly interest in disclosure of the grand jury records remains strong, as evidenced by the declarations of Nixon and Watergate historians and scholars who support the petition. At the same time, the interests that justify grand jury secrecy have dissipated in the thirty-five years since Mr. Nixon testified, and the various Watergate investigations concluded decades ago. Mr. Nixon and many Watergate principals are deceased. And various sources have provided information about the content of the Watergate-related grand jury proceedings. In this extraordinary set of circumstances, resulting from what the *New York Times* described as "the most momentous criminal investigation in American political history," Editorial, *Mr. Nixon's Testimony*, N.Y. Times, June 29, 1975, at 14 (Helisek Decl. Exh. 10), petitioners respectfully ask this Court to exercise discretion under its inherent supervisory authority and the All Writs Act, 28 U.S.C. § 1651, to order release of the transcript of Mr. Nixon's grand jury testimony, the deposition exhibits, and memoranda regarding and correspondence with Mr. Nixon's lawyer.

3

# FACTUAL BACKGROUND

The following summary of the Watergate scandal, President Nixon's grand jury testimony, and publicly disclosed Watergate-related grand jury material is drawn from the declarations of Professor Stanley Kutler, a Watergate historian, and Julian Helisek, a fellow at Public Citizen Litigation Group. Professor Kutler's declaration recounts the key events surrounding Watergate, describes efforts to preserve and make public the Nixon tapes, describes the extensive publicity that the Watergate scandal received at the time it occurred and in the decades since the events transpired, and refers to some of the revisionist history theories that have arisen. Mr. Helisek's declaration outlines what is known about President Nixon's grand jury testimony, reviews the investigations of the three Watergate grand juries, and identifies grand jury testimony previously made public.

Augmenting Professor Kutler's and Mr. Helisek's declarations are declarations from Nixon historians David Greenberg, Keith Olson, Rick Perlstein, and Melvin Small, author and former White House Counsel John W. Dean III, former Assistant Chief Counsel to the Senate Watergate Committee David Dorsen, Editor of the Nieman Watchdog Project at Harvard University's Nieman Foundation for Journalism and former District of Columbia Editor of the *Washington Post* Barry Sussman, Associate Professor of Media and Public Affairs at The George Washington University Mark Feldstein, Professor of History and Public Affairs at the Woodrow Wilson School of Public and International Affairs at Princeton University Julian Zelizer, Assistant Professor of History at California State University (San Bernardino) Thomas Long, Nixon Tapes Project Editor with the Presidential Recordings Project at the University of Virginia's Miller Center for Public Affairs Kenneth J. Hughes, Watergate journalist Don Fulsom, former Historian of the U.S. House of Representatives and current Director of the Robert C. Byrd Center for Legislative Studies Raymond

Smock, and former assistant special prosecutor with the Watergate Special Prosecution Force Richard J. Davis. All support release of Mr. Nixon's grand jury testimony.

## I.    The Plumbers, the Break-In, and Other Illegal Activities

Amid the Vietnam War and rising domestic crime and poverty, Richard Nixon was elected in 1968 after campaigning on the restoration of national unity and law and order. But from early on, Mr. Nixon's presidency was marked by distrust and conflict. In 1971, the *New York Times* published the so-called Pentagon Papers—a classified, 7,000-page document that traced the origins of American involvement in Vietnam and offered significant insight into decision-making processes in the foreign-policy and military establishments. Daniel Ellsberg, a former National Security Council operative with links to the CIA, was revealed as the source of the leak to the *New York Times*. The government unsuccessfully sued to prevent further publication of the Pentagon Papers. *See* Kutler Decl. ¶¶ 8-9.

The Ellsberg leak, its publication in the *New York Times*, and the Supreme Court's refusal to enjoin publication deeply troubled the President. In response, President Nixon created a "Special Investigations Unit" run directly out of the White House to surveil Mr. Nixon's political opponents and to stop unauthorized executive department leaks. That group came to be known as the "Plumbers." Its members included Egil "Bud" Krogh, G. Gordon Liddy, and E. Howard Hunt, among others. The group's first target was Ellsberg. *Id.* ¶¶ 10-11. Thus, when the Plumbers learned that the FBI had interviewed Ellsberg's former psychiatrist, Dr. Lewis Fielding, the group devised a scheme to raid Dr. Fielding's office to secure information about Ellsberg. In consultation with Nixon aides John Ehrlichman and Charles Colson, Liddy, Hunt, and several others carried out the burglary. *Id.* ¶ 12.

5

The Plumbers was but one part of a multifaceted design for the Nixon White House to monitor political opponents. The White House pressured the IRS to pursue liberal political organizations that had raised significant sums of money but had paid no taxes. The IRS established the Special Services Staff, which, in concert with the FBI, compiled information on numerous groups, including the Black Panther Party, National Urban League, ACLU, and National Education Association, and 4,000 individuals. *Id.* ¶ 13. In addition, White House Counsel John Dean and Colson kept an "enemies list," and the White House used the IRS to gather information about Mr. Nixon's enemies and to harass them.

At the request of the White House, the IRS audited *Washington Post* lawyer Edward Bennett Williams, aviator and financier Howard Hughes's Hughes Tool Company, Hughes aide Robert Maheu, columnist Jack Anderson, Democratic National Committee (DNC) Chairman Lawrence O'Brien, and others. *Id.* ¶ 15. Nixon's White House also gathered information about the President's enemies by wiretapping telephone conversations of National Security Council aides, journalists, and antiwar and civil rights activists.

As the 1972 presidential election drew near, President Nixon and his aides turned their sights on the DNC. *Id.* ¶ 17. On June 17, 1972, District of Columbia Metropolitan Police caught former CIA operative and then-security chief for President Nixon's campaign committee James McCord and four other men breaking into the DNC headquarters at the Watergate Hotel and Office Building in Washington, DC. The burglars were arrested and found carrying electronic surveillance and photographic equipment and thousands of dollars in cash. Investigators discovered evidence that linked the burglars to Hunt and Liddy. *Id.* ¶¶ 17, 19.

At the time, Liddy was counsel for the Committee to Re-elect the President (CREEP). CREEP included Committee Chair and Attorney General John Mitchell, Deputy Director Jeb Magruder, Finance Chair Maurice Stans, Treasurer Hugh Sloan, and Mitchell aide Fred LaRue. The Watergate break-in had its origins in a CREEP scheme called "Gemstone." Liddy's brainchild, "Gemstone" involved electronic surveillance of political opponents, the use of call girls to compromise Democratic candidates, and the kidnapping of radical leaders. *Id.* ¶ 18. The Watergate break-in was a variant of the unexecuted Gemstone scheme.

O'Brien was an important figure in another incident that was subsumed within the broader Watergate scandal and discussed during Mr. Nixon's grand jury testimony: the $100,000 contribution from Howard Hughes to Mr. Nixon's friend Bebe Rebozo. *Id.* ¶ 24. By the late 1960s, Hughes's powerful commercial empire included industries ranging from aeronautics to casinos. Hughes planned to make a political contribution of $100,000 to President Nixon's 1972 reelection campaign, presumably in exchange for access and influence. The payment was not made to Mr. Nixon directly, but to Rebozo, in two installments of $50,000 apiece. Rebozo had a number of responsibilities on behalf of the White House and President Nixon, such as fundraising for the President's reelection campaign and acting as agent for President Nixon in the purchase, improvement, and maintenance of Mr. Nixon's vacation home in Key Biscayne, Florida. *Id.* ¶¶ 24-26. In later testimony about the $100,000, he claimed that the $100,000 was for President Nixon's 1972 reelection campaign. He claimed that he simply had not disbursed the money and, having failed

to do so, returned the $100,000 to Hughes. In fact, most of the $100,000 was spent on behalf of Mr. Nixon to furnish and improve his home in Key Biscayne. *Id.* ¶¶ 25-26.[3]

## II. The Cover-Up, Investigations, and Resignation

On the day of the Watergate break-in, President Nixon was in Florida. After returning to Washington a few days later, he began to think of ways to distance the White House from the break-in. So began the Nixon White House's efforts to cover-up or contain the Watergate break-in story—a story that Nixon Press Secretary Ron Ziegler initially dismissed as a "third-rate burglary." *Id.* ¶ 31.

The cover-up took numerous forms. Mitchell and Liddy tried to have then-Attorney General Richard Kleindienst release some of the burglars. Magruder and Haldeman aide Gordon Strachan destroyed documents. And White House officials paid the burglars for their silence. *Id.* ¶ 32.

The President insisted that no one then employed in his administration was involved with the break-in. Nonetheless, in a June 24, 1972 letter, DNC Chairman O'Brien pushed President Nixon to appoint a special prosecutor to investigate the matter. Mr. Nixon refused, citing investigations by the Department of Justice (DOJ), CREEP, the General Accounting Office, and House Banking and Currency Committee. *Id.* ¶ 23. At the same time, the White House was working to sabotage various investigations, including those by the FBI and the House Banking and Currency Committee. *Id.* ¶¶ 31-33. For instance, President Nixon instructed his chief of staff, H.R. Haldeman, to tell the FBI to stop investigating the break-in under the pretense that continued investigation would interfere with CIA operations and national security interests. *Id.* ¶ 31.

---

[3]Hughes almost certainly benefitted from the transaction. In 1969, the Civil Aeronautics Board allowed Hughes to buy Air West, a small passenger airline. In 1970, DOJ halted an antitrust action that would have sought to prevent Hughes from purchasing additional Las Vegas casinos. *The Nation: The Hughes Connection*, Time, Oct. 22, 1973.

Things began to fall apart for President Nixon and his aides shortly after the President's landslide election victory in 1972. Hunt, Liddy, McCord, and the other Watergate burglars had been indicted on multiple counts of burglary, conspiracy, and interception of wire and oral communications. Their trial began on January 10, 1973, in the District Court for the District of Columbia, with Judge John Sirica presiding. Between January 11-15, 1973, Hunt and four other burglars pleaded guilty to the charges against them. On January 30, the jury convicted McCord and Liddy on all counts. *Id.* ¶¶ 35-37.

While the break-in trial was pending, Senators Mike Mansfield and Sam Ervin spearheaded the passage of Senate Resolution 60, which created the Senate Select Committee on Presidential Campaign Activities (commonly referred to as the Senate Watergate Committee) to "conduct an investigation and study of the extent, if any, to which illegal, improper, or unethical activities were engaged in by any persons, acting individually or in combination with others, in the presidential election of 1972, or any campaign, canvass, or other activity related to it." *Id.* ¶ 39 (quoting S. Res. 60, 93d Cong. (1973)).

On March 20, 1973, three days before sentencing was scheduled in the Watergate break-in case, McCord, hoping for leniency, sent Judge Sirica a letter in which he explained that he and other defendants had been pressured to keep silent about the involvement of any higher-ups, that perjury had occurred during trial, and that Watergate was not a CIA operation. *Id.* ¶ 38. Shortly after news of McCord's letter to Judge Sirica became public, McCord met with members of the Senate Watergate Committee and implicated Dean, Magruder, Mitchell, and Colson in the Watergate operation. At about the same time, L. Patrick Gray, whom Mr. Nixon had nominated to be FBI Director, was testifying before the Senate in his confirmation hearing. When asked about the limited

scope of the FBI's Watergate investigation, Gray admitted that he had regularly submitted FBI investigative reports to White House Counsel Dean. *Id.* ¶¶ 40-41.

On April 14, 1973, Magruder told investigators that Mitchell masterminded the Watergate break-in and that Dean covered it up. The next day, Attorney General Kleindienst and Henry Petersen, head of DOJ's Criminal Division, met with President Nixon to inform him that they believed that White House and CREEP officials were involved in the Watergate cover-up. In a televised address on April 30, 1973, Mr. Nixon announced the resignations of Haldeman, Ehrlichman, Dean, and Kleindienst. Elliot Richardson succeeded Kleindienst as Attorney General. *Id.* ¶¶ 42-43.

Soon after, Richardson selected Harvard Law Professor Archibald Cox as the Watergate Special Prosecutor, to investigate all possible offenses of the Nixon Administration. In May 1973, Cox's office took over the Watergate case from the U.S. Attorney's office. Although prosecutors at DOJ wanted to depose President Nixon, Cox decided against it. He believed that, as a constitutional matter, if anyone were to investigate the President, it should be Congress. *Id.* ¶¶ 44-46.

The Senate Watergate Committee hearings began in May 1973. President Nixon refused to appear before the Senate Committee. He likewise refused to furnish private papers, claiming that to do so would undermine the principle of separation of powers. After presidential aide Alexander Butterfield revealed the existence of a White House tape recording system and that President Nixon had tape recordings of his conversations and telephone calls in the Oval Office and elsewhere, the Committee issued a subpoena ordering Mr. Nixon to deliver the tapes to the Committee. Cox, too, issued a grand jury subpoena for White House tapes. Invoking executive privilege, Mr. Nixon rejected both subpoenas. *Id.* ¶¶ 47-49.

In August 1973, Judge Sirica ordered the President to comply with the subpoena. Rather than doing so, Mr. Nixon suggested that he would prepare transcripts of the tapes, to be authenticated by Democratic Senator John Stennis of Mississippi and then turned over to Judge Sirica. Cox rejected the so-called "Stennis compromise." *Id.* ¶¶ 49-50. President Nixon then asked Attorney General Richardson to fire special prosecutor Cox. Richardson refused and resigned. Deputy Attorney General William Ruckelshaus similarly refused to fire Cox, and he too resigned. Solicitor General Robert Bork, third in command at DOJ and the Acting Attorney General following the resignations of Richardson and Ruckelshaus, fired Cox. These resignations and Cox's firing on October 20, 1973, came to be known as the "Saturday Night Massacre." *Id.* ¶ 51.

By order dated October 23, 1973, Bork abolished the Office of the Special Prosecutor. The Watergate prosecution temporarily reverted back to Petersen at DOJ, and his office continued the work of the Watergate Special Prosecution Force (WSPF) for several weeks until Bork reestablished the special prosecutor's office, likely in response to the public outcry that followed the Saturday Night Massacre. Bork named Leon Jaworski the new special prosecutor. Not long thereafter, the House Judiciary Committee began to organize an inquiry into possible impeachment proceedings against President Nixon. *Id.* ¶¶ 52-54.

On October 30, 1973, Nixon aides informed Judge Sirica that two of the subpoenaed tapes did not exist. Aides also informed Judge Sirica that a tape containing a June 20, 1972, conversation between President Nixon and Haldeman had an 18½-minute gap in the recording. *Id.* ¶ 55.

In January 1974, prosecutors requested twenty-five additional tapes from the White House. The following month, the House Judiciary Committee requested forty-two taped conversations. On March 1, the grand jury indicted Mitchell, Haldeman, Ehrlichman, Colson, Strachan, and two others

on charges of conspiracy, obstruction of justice, and perjury in connection with their roles in covering-up the Watergate break-in. The grand jury also authorized Jaworski to name President Nixon as an unindicted co-conspirator. In connection with the pending trial of those indicted on March 1, Jaworski sought to obtain additional taped conversations. The district court issued a subpoena for those tapes on April 18, 1974. *Id.* ¶ 60.

On April 29, 1974, President Nixon appeared on television and announced that he would release tape transcripts rather than the tapes themselves. Upon reviewing the transcripts, the House Judiciary Committee concluded that the documents contained inaccuracies. The Committee had previously "obtained some of the tapes of conversations included in the transcripts, and comparison of the WSPF transcripts with White House transcripts showed that the latter contained several omissions of portions of conversations." *Id.* ¶¶ 61-62 (quoting WSPF Final Report). The WSPF began a "full-scale investigation to determine whether various materials were deleted from the transcripts for the purpose of obstructing the Judiciary Committee's inquiry." *Id.* ¶ 62 (quoting WSPF Final Report). The WSPF concluded that, despite "strong circumstantial evidence that at least some of the lengthy deletions were deliberate," prosecutors lacked evidence of criminal intent to bring charges in connection with the altered tape transcripts. *Id.* (quoting WSPF Final Report).

On May 20, 1974, Judge Sirica ordered Mr. Nixon to comply with the April 18 tapes subpoena. Both parties petitioned the Supreme Court for certiorari, which the Court granted on May 31, 1974. *Id.* ¶ 63. While the tapes case was before the Supreme Court, the House Judiciary Committee began to draw up articles of impeachment. On July 24, 1974, a unanimous Supreme Court held that President Nixon must surrender the tapes. As the House Judiciary Committee voted

on articles of impeachment, the White House complied with the Supreme Court's decision and turned over the tapes. *Id.* ¶¶ 64-66.

On August 9, 1974, facing the prospect of removal by impeachment, President Nixon resigned from office. Vice President Gerald Ford was sworn in as president. The following month, President Ford issued Mr. Nixon a full pardon.

## III. President Nixon's Grand Jury Testimony

Although he had resigned from office, prosecutors in the WSPF sought Mr. Nixon's sworn testimony. Following his resignation, Mr. Nixon had returned to his home in San Clemente, California. Not long thereafter, his health began to deteriorate, and the former president was physically unable to travel across the country to appear before the grand jury in Washington, DC. He agreed to testify under oath in San Clemente. Helisek Decl. ¶¶ 5-7.

On June 23-24, 1975, for the first time in history, a former United States president testified before a grand jury. Mr. Nixon testified for eleven hours before two members of the Watergate grand jury and several WSPF attorneys. The testimony took place at the United States Coast Guard Station in San Clemente. Available information indicates that Special Prosecutor Henry Ruth, Jr., WSPF attorneys Thomas McBride, Richard Davis, Judith Ann Denny, Paul Michel, Jay Horowitz, Frank Martin, and Henry Hecht, a stenographer, and two grand jurors attended. Mr. Nixon's lawyers and Ruth filed a stipulation in U.S. District Court on Thursday, June 26, 1975, stating that Mr. Nixon desired that the fact of the proceeding be made public. *See id.* ¶¶ 7-8, 10.

A 297-page transcript of President Nixon's grand jury testimony was made available to the grand jurors who did not travel from Washington, DC, to San Clemente. *Id.* ¶ 9. Press accounts indicate that Mr. Nixon was questioned on at least four topics: (1) the 18½-minute gap, (2)

alterations of the White House transcripts of tape recordings that were submitted to the House Judiciary Committee during its impeachment inquiry, (3) the extent to which the Nixon administration used the IRS to harass Mr. Nixon's political enemies, and (4) the $100,000 campaign contribution from Hughes to Rebozo. *Id.* ¶ 11.

The press recognized the testimony as big news. On June 25, the *Washington Post* announced it with a banner headline and devoted the newspaper's two lead stories to it. *See* Sussman Decl., Attachment. Because the content of the testimony was sealed, however, the stories primarily reported on the fact of it. *See id.* Still, from the start, the importance of the testimony to understanding the record of Watergate was apparent. *See* Editorial, *Mr. Nixon's Testimony*, N.Y. Times, *supra* (editorial discussing importance of the testimony for the public record and urging that "a way should be found to make this testimony available to the public"). Since then, some aspects of the testimony have been mentioned publicly, but the majority of the content remains secret.

The grand jury's term expired on July 3, 1975. It handed up no indictments following Mr. Nixon's testimony. Helisek Decl. ¶ 12.

## IV. Identity of Petitioners

Petitioners Professor Stanley Kutler, the American Historical Association, the American Society for Legal History, the Organization of American Historians, and the Society of American Archivists have long-standing professional interests in President Nixon's Watergate grand jury testimony. Professor Kutler is recognized as the preeminent historian on the Watergate scandal. He is Professor Emeritus at the University of Wisconsin and has authored numerous books and articles on Watergate. The American Historical Association is the nation's largest historical society for professionals, founded in 1884 for the promotion of historical studies, the collection and preservation

14

of historical documents and artifacts, and the dissemination of historical research. The American Society for Legal History is a nonprofit membership organization dedicated to fostering scholarship, teaching, and study concerning the law and institutions of all legal systems. The Organization of American Historians is the largest professional society for the teaching and study of American history. The Society of American Archivists is the oldest and largest national archival professional association in the United States, dedicated to ensuring the identification, preservation, and use of records of historical value.

## ARGUMENT

Courts have inherent authority to order the release of grand jury records in cases of historical importance. When deciding whether to release historically important grand jury records, courts balance the need to maintain secrecy against the general historical importance of the case and the specific historical importance of the grand jury material. Specifically, courts consider the applicability of conventional justifications for grand jury secrecy: to preserve the anonymity of grand jurors, which fosters uninhibited deliberations; to protect grand jury witnesses from tampering; and to avoid alerting suspects about the grand jury's investigation. Against those considerations, courts balance factors including the identity of the petitioners, the materials requested, the reasons disclosure is sought, how long ago the grand jury proceedings occurred, and whether portions of grand jury material previously have been disclosed.

If any grand jury material ever merited release because of its historical importance, Mr. Nixon's testimony surely does. The Watergate scandal represents a defining moment of late twentieth-century American political, legal, and sociocultural history. It exposed corruption in the highest levels of government, fueled public distrust in elected leaders, and presented unprecedented

15

constitutional controversies. Despite the passage of more than thirty-five years, interest in Watergate remains strong. As the supporting declarations of eminent Watergate scholars explain, critical questions still hound those who study Watergate. "Without Mr. Nixon's own version of events, taken under conditions comparable to the testimony of all the other conspirators in the White House, the public record and the legacy of Watergate remains incomplete." Editorial, *Mr. Nixon's Testimony*, N.Y. Times, *supra*. The President's statements "could be vital in determining the truth." Kutler Decl. ¶ 45 (quoting memorandum from U.S. Attorney Earl Silbert to Special Prosecutor Archibald Cox).

None of the conventional justifications for grand jury secrecy applies in this matter. The Watergate Special Prosecution Force concluded its work in October 1975, months after the grand jury had been dismissed. The single witness whose testimony petitioners seek, Richard Nixon, is deceased, as are numerous other Watergate principals. Any secrecy interests that may have attached to the grand jury records have eroded.

## I. The Court Has Authority To Unseal Historically Significant Grand Jury Records In Special Circumstances.

Federal courts follow the "long-established policy that maintains the secrecy of the grand jury proceedings." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 (1958). But grand jury secrecy "is not absolute." *In re Biaggi*, 478 F.2d 489, 492 (2d Cir. 1973). For example, under Federal Rule of Criminal Procedure 6(e)(3), a court may authorize disclosure of a grand-jury matter "preliminarily or in connection with a judicial proceeding," Fed. R. Crim. P. 6(e)(3)(E)(i), or "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). A court has substantial discretion to determine whether grand jury transcripts should be released, *Douglas Oil Co. v. Petrol*

*Stops Nw.*, 441 U.S. 211, 223 (1979), and "Rule 6(e) is but declaratory" of that principle. *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959). Grand jury proceedings are conducted secretly to preserve the anonymity of grand jurors, to facilitate uninhibited deliberations, to protect witnesses against tampering, to encourage full disclosure, and to avoid alerting suspects about the investigation and possible cooperating witnesses.

When warranted by special circumstances, courts also have inherent authority to order release of grand jury material outside Rule 6(e)'s enumerated exceptions. *United States v. Aisenberg*, 358 F.3d 1327, 1347 (11th Cir. 2004) (citing *In re Petition to Inspect & Copy Grand Jury Materials (In re Hastings)*, 735 F.2d 1261 (11th Cir. 1984)); *In re Petition of Craig*, 131 F.3d at 102-03; *see also In re Special Grand Jury 89-2*, 450 F.3d 1159, 1178-79 (10th Cir. 2006) (remanding to district court to decide whether case presented exceptional circumstances, without deciding question of courts' inherent authority); *In re Special Feb., 1975 Grand Jury*, 662 F.2d 1232, 1235-36 (7th Cir. 1981) (noting that the "court in rare situations may have some discretion to slip entirely around Rule 6(e) and permit disclosure"), *aff'd on other grounds sub nom.*, *United States v. Baggot*, 463 U.S. 476 (1983).

In cases of particular importance, historical interest may qualify as a special circumstance justifying release of grand jury records. *Craig*, 131 F.3d at 105; *see In re Am. Historical Ass'n*, 49 F. Supp. 2d 274, 287-88 (S.D.N.Y. 1999). Thus, for instance, in both *American Historical Association*, and *In re Petition of National Security Archive*, Summary Order at 1-2, 08 Civ. 6599 (S.D.N.Y. Aug. 26, 2008), ECF No. 3, the Southern District of New York ordered release of the entire grand jury records pertaining to the indictments of Alger Hiss and of Julius and Ethel Rosenberg, respectively, in light of the historical impact of those cases.

17

A decade earlier, historian Gary May sought the release of grand jury records pertaining to indictments of William Remington, a prominent public official whom Elizabeth Bentley accused of being a Communist spy. In *In re Petition of May*, 13 Media L. Rep. (BNA) 2198 (S.D.N.Y. 1987) (a copy of this decision is attached), the court found that the "undisputed historical interest" in the Remington case gave the public "a strong interest in having its understanding of the administration of justice in this case based on complete and accurate historical evidence," *id.* at 2199, and ordered the records released. Several years after *May*, in *In re Petition of O'Brien*, another district court ordered the disclosure of grand jury records from the 1945 Columbia, Tennessee race riot investigation. No. 3-90-X-35 (M.D. Tenn. 1990) (cited in *Am. Historical Ass'n*, 49 F. Supp. 2d at 293) (no opinion issued). More recently, in *In re Petition of Tabac*, 2009 WL 5213717, at *1-*2 (M.D. Tenn. Apr. 14, 2009), retired law professor William Tabac petitioned for the release of grand jury material pertaining to the indictment of Jimmy Hoffa. Finding the grand jury testimony to be "of great historical importance," the court held that the petitioner had satisfied his burden of demonstrating special circumstances and ordered release of certain requested grand jury records. *Id.* at *2. The government did not appeal in any of these five cases.

Although the District of Columbia Circuit has not squarely addressed the courts' authority to order release of grand jury material in circumstances other than those enumerated in Rule 6(e), that court has ordered disclosure of grand jury material in circumstances *not* expressly listed in the rule. *See, e.g.*, *In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152, 154-55 (D.C. Cir. 2007) (releasing grand jury material because it became "sufficiently widely known" that it lost "its

character as Rule 6(e) material" (internal quotation marks omitted)).[4] Moreover, district courts within

the District of Columbia Circuit have implicitly recognized federal courts' inherent power to order

release of grand jury material under circumstances not enumerated in Rule 6(e). *See, e.g., In re*

*Report & Recommendation of June 5, 1972 Grand Jury*, 370 F. Supp. 1219, 1229 (D.D.C.) (Rule

6(e) did not bar court from disclosing grand jury report and recommendation to congressional

committee), *mandamus denied sub nom. Haldeman v. Sirica*, 501 F.2d 714, 715 (D.C. Cir. 1974);

*In re Bullock*, 103 F. Supp. 639, 641-42 (D.D.C. 1952) (rejecting a "literal interpretation" of Rule

6(e) and ordering release of grand jury records to the Commissioners of the District of Columbia to

undertake a disciplinary investigation of a Metropolitan Police Department officer).

## II. The Special Circumstances Surrounding Watergate Warrant Release of President Nixon's Grand Jury Testimony and Associated Materials of the Watergate Special Prosecution Force.

The "special circumstances" test articulated in *Craig* and applied by district courts in several

subsequent cases provides a framework for evaluating requests to open grand jury records. *Craig* sets

forth a fact-intensive inquiry in which the court, weighing nine factors, balances the historical

importance of the grand jury records against the need to maintain secrecy: (i) the identity of the

parties seeking disclosure, (ii) whether the government or the defendant in the grand jury proceeding

opposes disclosure, (iii) why the disclosure is sought, (iv) what specific information is sought, (v)

---

[4] In *In re Petition of Newman*, No. 87-5345 (D.C. Cir. Apr. 20, 1988) (unpublished memorandum), the court held that Rule 6(e) does not provide for disclosure of grand jury transcripts to a private party, but it did not hold that a district court lacks inherent authority to order the release of grand jury materials outside the rule's enumerated exceptions. As the government stated in its opposition to Mr. Newman's unsuccessful petition for certiorari, "the District of Columbia Circuit has not rejected the 'inherent authority' rationale for disclosure in all cases." Brief for the United States in Opposition at 9, Newman v. United States, 109 S. Ct. 784 (1989) (No. 88-548). In any event, the two-page unpublished memorandum opinion in *Newman*, is "not to be cited as precedent." D.C. Cir. Rule 32.1(b); *cf.* Fed. R. App. P. 32.1.

the age of the grand jury records, (vi) the current status—living or dead—of the grand jury principals and of their families, (vii) the extent to which the grand jury records sought have been previously made public, either permissibly or impermissibly, (viii) the current status—living or dead—of witnesses who might be affected by disclosure, and (ix) any additional need for maintaining secrecy. *See Craig*, 131 F.3d at 105-06; *cf. Douglas Oil Co.*, 441 U.S. at 223 (Under Rule 6(e), it is "clear that as the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification.").

Applying these factors, the court in *American Historical Association* concluded that the historical interest in the Hiss case greatly outweighed the need to maintain secrecy. *See* 49 F. Supp. 2d at 297. The court was persuaded in large part because the petitioners (1) identified "numerous, specific historical issues to which the grand jury materials are allegedly relevant," (2) submitted to the court a "comprehensive review of all publicly available information concerning the Hiss case," (3) "garnered . . . the ardent support of ten historians, many eminent in their respective fields; well-known journalists; a documentary film-maker; and friends and family of Hiss and Chambers," and (4) sought grand jury records of an "important historical figure." *Id.* at 289, 291. In ruling that the historical interest in the Hiss case outweighed the need to maintain secrecy, the court analyzed both the general historical importance of the Alger Hiss case and the specific historical importance of the grand jury records. *Id.* at 293-97.

As controversial and newsworthy as the Hiss case was, Watergate has had an even greater impact on the American consciousness and has taken on a more profound historical importance.

## A. General Historical Importance of the Watergate Criminal Investigations

Although the court in *American Historical Association* did not base its release of the grand jury records solely on the general historical interest of the Hiss case, it noted that general historical interest alone may have been an appropriate basis for the release of the grand jury records. Sufficiently old records give the public "a significant, if not compelling, interest in ensuring the pages of history are based upon the fullest possible record." 49 F. Supp. 2d at 295. This interest is especially strong when the "case fosters vigorous and sustained debate not only about the case itself, but also about broader issues concerning fundamental and, at times, countervailing aspects of our democracy," such as separation of powers, governmental investigative power, and the role and function of the grand jury—all of which are relevant to Watergate. *Id.* Disclosure in cases involving such issues is appropriate and positive because it "undermines the false conspiracy theories and revisionism that tend to arise when information remains secret" and "can only, in the long run, build confidence in our government by affirming that it is open, in all respects, to scrutiny by the people." *Id.*

Here, the general historical importance of Watergate should be beyond debate. It is proved by its lasting influence in the American academic world and in popular culture. At the same time, questions remain about the break-in, the cover-up, and related affairs. Watergate has also provoked intense disagreement over President Nixon's legacy, as competing narratives about the man and the scandal have continued to develop.

## 1. Widespread Contemporaneous Interest in Watergate

Watergate drew wide publicity in its time. Watergate coverage became a regular fixture of national dailies, news magazines, and television broadcasts.[5] The Senate Watergate Committee's investigative hearings and the House Judiciary Committee's impeachment hearings were broadcast live on the three major networks. *See* Kutler Decl. ¶ 73; *see generally* Gladys Engel Lang and Kurt Lang, *The Battle for Public Opinion: The President, the Press, and the Polls During Watergate* (1983) (discussing extensive press coverage). Watergate also attracted significant international interest because of suspected White House involvement in the scandal. *See generally* James Trezise et al., *Watergate: A Crisis for the World: A Survey of British and French Press Reaction Toward an American Political Crisis* (1980) (discussing extent of foreign press coverage).

While President Nixon was in office, and in the first few years immediately following his resignation, numerous books on Watergate were published—some penned by principals in the Watergate story and others by historians.[6] A Hollywood film, *All the President's Men* (Warner Bros.

---

[5] *See, e.g.*, Aldo Beckman, *Nixon Takes 'Bug' Blame; 3 Key Aides Resign, 1 Fired*, Chi. Trib., May 1, 1973, at 1; Robert L. Jackson and Ronald J. Ostrow, *M'Cord Says Dean, Magruder Knew in Advance of Bugging*, L.A. Times, Mar. 26, 1973, at 1; *Nixon Says He'll Comply Fully with Order to Turn over Tapes*, Atlanta Const., July 25, 1974, at 1; Martin F. Nolan, *Nixon Fires Cox, Richardson Resigns; FBI Agents Seal Prosecutor's Office*, Bos. Globe, Oct. 21, 1973, at 1; Bob Woodward and E.J. Bachinski, *White House Consultant Tied to Bugging Figure*, Wash. Post, June 20, 1972, at 1. For a list of more than one thousand Watergate-related newspaper articles, editorials, and political cartoons published in the *Washington Post* alone—and only from the period beginning June 16, 1972, through June 30, 1973—see Joan Schilling, *The Watergate Index: An Index to "Watergate" Material as Reported in the Washington Post Between June 16, 1972, and June 30, 1973*, at 107-21 (1975).

[6] *See, e.g.*, Samuel Dash, *Chief Counsel: Inside the Ervin Committee–The Untold Story of Watergate* (1976); John Dean, *Blind Ambition* (1976); H.R. Haldeman and Joseph DiMona, *The Ends of Power* (1978); Leon Jaworski, *The Right and the Power: The Prosecution of Watergate* (1976); J. Anthony Lukas, *Nightmare: The Underside of the Nixon Years* (1973); Frank Mankiewicz,
(continued...)

Pictures 1976), a theatrical play, *Watergate Classics* (Yale Repertory Theatre 1973), and a television mini-series, *Watergate: Behind Closed Doors* (Paramount Television 1977), were also produced during that time.

Moreover, in direct response to the Watergate scandal, Congress enacted legislation to curb government secrecy and corruption: the Ethics in Government Act of 1978, 5 U.S.C. App. 4 §§ 501-05, which established rules governing financial disclosure and lobbying; the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. §§ 1801-85, which established rules governing surveillance activities and searches of foreign entities; the Presidential Recordings and Materials Preservation Act of 1974, 44 U.S.C. § 2111 note, which placed President Nixon's presidential records into federal custody, and the Presidential Records Act of 1978, 44 U.S.C. §§ 2201-2207, which governs the official records of presidents and vice presidents created or received after January 20, 1981. These important statutes further reflect the historical significance of Watergate. *See* Zelizer Decl. ¶¶ 3, 4 (discussing legislative response to Watergate).

### 2. Interest in Nixon Records

Interest in Watergate sparked significant litigation over the disposition of and public access to Nixon Administration records, including the tapes. Cases fell primarily into two categories.

**a.** The first category involved the disposition of President Nixon's White House tapes. Enacted four months after President Nixon's resignation, the Presidential Recordings and Materials

---

(...continued)
*U.S. v. Richard M. Nixon: The Final Crisis* (1975); Jeb Stuart Magruder, *An American Life: One Man's Road to Watergate* (1974); James W. McCord, *A Piece of Tape: The Watergate Story: Fact and Fiction* (1974); Lawrence F. O'Brien, *No Final Victories: A Life in Politics–from John F. Kennedy to Watergate* (1974); Raymond Price, *With Nixon* (1977); John J. Sirica, *To Set the Record Straight: The Break-in, the Tapes, the Conspirators, the Pardon* (1979).

Preservation Act of 1974 (PRMPA) directed the Archivist of the United States General Service Administration (GSA) to take custody of President Nixon's presidential papers and tape recordings, to protect them from destruction, and to promulgate regulations to provide for public access. From 1974-1977, the National Archives and Records Administration (NARA) issued four sets of PRMPA regulations, the first three of which were rejected by Congress. *See Public Citizen v. Burke*, 843 F.2d 1473, 1476 n.3 (D.C. Cir. 1988). Mr. Nixon unsuccessfully challenged the constitutionality of the PRMPA, *see Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977), as well as the fourth set of regulations, *see Nixon v. Solomon*, No. 77-1395 (D.D.C. filed 1978). The latter case settled, enabling NARA to begin processing the materials. In 1980, NARA issued a fifth set of regulations, which Mr. Nixon unsuccessfully challenged in *Nixon v. Freeman*, 670 F.2d 346 (D.C. Cir. 1982), but which was successfully challenged in *Allen v. Carmen*, 578 F. Supp. 951 (D.D.C. 1983) (in suit by 29 former Nixon Administration employees, holding regulations unconstitutional in light of one-house veto provision).

Also in 1980, in his final suit with respect to the PRMPA, Mr. Nixon sought compensation for the presidential materials, alleging that the PRMPA effected a taking under the Fifth Amendment. *Nixon v. United States*, 978 F.2d 1269 (D.C. Cir. 1992). In 1985, NARA proposed a sixth set of regulations, which the Department of Justice stated must be "interpreted" for constitutional reasons as requiring the Archivist to acquiesce in any claim of executive privilege asserted by Mr. Nixon to block disclosure of materials. The Archivist adopted that interpretation, and the non-profit organization Public Citizen successfully sued to challenge it. *Public Citizen*, 843 F.2d at 1480.

This series of cases demonstrates the significant constitutional issues resulting from Watergate, and thus underscores the general historical importance of the materials sought in the petition.

The cases also illustrate the significant interest—both governmental and public—in preserving and accessing materials that shed light on President Nixon's role in Watergate and related matters.

**b.** The second category of cases even more directly shows the significant historical interest in accessing Watergate materials so as to complete the historical record. This category involves litigation seeking disclosure of Watergate-related materials under the Freedom of Information Act (FOIA) and other statutes. Two of the early FOIA lawsuits sought documents relating to the role of former FBI director L. Patrick Gray in Watergate, *see Open Am. v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976), and an internal WSPF memorandum regarding the Special Prosecutor's decision not to seek to indict President Nixon. *See Niemeier v. Watergate Special Prosecution Force*, 565 F.2d 967 (7th Cir. 1977). FOIA suits in the 1980s sought disclosure of the transcripts of tape recordings of White House conversations involving President Nixon, *see Ricchio v. Kline*, 773 F.2d 1389 (D.C. Cir. 1985), and documents of the Watergate Special Prosecution Force pertaining to, among other things, investigations of the 18½-minute tape gap and illicit campaign contributions, including the Hughes-Rebozo payment. *See Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856 (D.C. Cir. 1981). And from 1992-1998, Professor Stanley Kutler, a petitioner here, litigated a FOIA case against NARA seeking release of the Nixon tape recordings that NARA had deemed were not restricted from release. *See Kutler v. Carlin*, 139 F.3d 237 (D.C. Cir. 1998). Thus, two decades after the events of Watergate, historical interest in Watergate-related materials continued to drive litigation.

### 3. Continuing Historical Interest in Watergate

Watergate has remained a hot topic of interest and debate among historians and the general public during the more than thirty-six years since President Nixon's resignation, as evidenced by the

large numbers of publications about the controversy,[7] including books written by Watergate

principals, throughout this period.[8] Production of Hollywood films,[9] theatrical plays,[10] a television

documentary,[11] and more than one mini-series[12] have also continued during this period.

The passage of time has allowed scholars to consider Watergate vis-a-vis separation of

powers, executive privilege, campaign finance law, legal ethics, and the role of impeachment and

the pardon power in the American constitutional scheme. See Zelizer Decl ¶ 3 ("The scandal ...

raised important questions about the balance of power between Congress and the president, with

growing awareness of the problems that had resulted from the growth of presidential power

---

[7] *See, e.g.,* Fred Emery, *Watergate: The Corruption of American Politics and the Fall of Richard Nixon* (1994); Stanley I. Kutler, *The Wars of Watergate: The Last Crisis of Richard Nixon* (1990); Keith W. Olson, *Watergate: The Presidential Scandal That Shook America* (2003); Melvin Small, *The Presidency of Richard Nixon* (1999); Anthony Summers and Robbyn Swan, *The Arrogance of Power: The Secret World of Richard Nixon* (2000).

[8] *See, e.g.,* John Connally and Mickey Herskowitz, *In History's Shadow: An American Odyssey* (1993); Harry S. Dent, *Cover-Up: The Watergate in All of Us* (1986); John Ehrlichman, *Witness to Power: The Nixon Years* (1982); Sam J. Ervin, Jr., *The Whole Truth: The Watergate Conspiracy* (1980); Mark Felt and John O'Connor, *A G-Man's Life: The FBI, 'Deep Throat' and the Struggle for Honor in Washington* (2006); Leonard Garment, *Crazy Rhythm: My Journey from Brooklyn, Jazz, and Wall Street to Nixon's White House, Watergate, and Beyond . . .* (1997); H.R. Haldeman, *The Haldeman Diaries: Inside the Nixon White House* (1994); Richard Kleindienst, *Justice: The Memoirs of Attorney General Richard Kleindienst* (1985); Egil "Bud" Krogh and Matthew Krogh, *Integrity: Good People, Bad Choices, and Life Lessons from the White House* (2007); G. Gordon Liddy, *Will: The Autobiography of G. Gordon Liddy* (1996); William Safire, *Before the Fall: An Inside View of the Pre-Watergate White House* (2005).

[9] *See, e.g., Frost/Nixon* (Universal Pictures 2008); *Nixon* (Cinergi Pictures Entm't 1995).

[10] *See, e.g., Dirty Tricks* (Public Theater 2004); *Frost/Nixon* (Madover, et al., 2007); *Martha Mitchell Calling* (Shakespeare & Co. 2006); *Nixon's Nixon* (MCC 1996).

[11] *See, e.g., Watergate Plus 30: Shadow of History* (Carlton Prods. 2003).

[12] *See, e.g., The American Experience: Nixon* (PBS 1998); *Watergate* (Discovery Commc'ns 1994).

throughout the twentieth century."). Scholars have written numerous books and articles on those aspects of Watergate, including quite recently.[13]

Moreover, in the thirty-six years since President Nixon's resignation, a handful of historians have published competing narratives of the scandal. Not unlike the divide in the academic community as to the guilt or innocence of Julius and Ethel Rosenberg, Watergate historians are divided as to the extent of Mr. Nixon's culpability. Although most historians agree that members of President Nixon's White House engaged in criminal conduct, and that President Nixon had knowledge of their actions, some historians have tried to exculpate President Nixon or his aides. *See, e.g.,* Geoff Shepard, *The Secret Plot to Make Ted Kennedy President: Inside the Real Watergate Conspiracy* (2008) (accusing Congressional Democrats of bringing down President Nixon in an effort to place Senator Ted Kennedy in the White House); James Rosen *The Strong Man: John Mitchell and the Secrets of Watergate* (2008) (trying to exculpate John Mitchell); Len Colodny and Robert Gettlin, *Silent Coup: The Removal of a President* (1992) (blaming White House Counsel John Dean for the Watergate cover-up); Jim Hougan, *Secret Agenda: Watergate, Deep Throat and*

_____

[13]*See, e.g.,* Howard Ball, *We Have a Duty: The Supreme Court and the Watergate Tapes Litigation* (1990); H. Lowell Brown, *High Crimes and Misdemeanors in Presidential Impeachment* (2009); Harry P. Jeffrey and Thomas Maxwell-Long, eds., *Watergate and the Resignation of Richard Nixon: Impact of a Constitutional Crisis* (2004); David E. Kyvig, *The Age of Impeachment: American Constitutional Culture Since 1960* (2008); Bill Moyers, *The Secret Government: The Constitution in Crisis* (1988); Mark J. Rozell, *Executive Privilege: Presidential Power, Secrecy, and Accountability* (2010); Kathleen Clark, *Legacy of Watergate for Legal Ethics Instruction*, 51 Hastings L.J. 673 (2000); Donald J. Simon, *Beyond Post-Watergate Reform: Putting an End to the Soft Money System*, 24 J. Legis. 167 (1998); Mark Tushnet, *The Ambiguous Legacy of Watergate for Separation of Powers Theory: Why Separation of Powers Law is not "Richard Nixon" Law*, 18 Nova L. Rev. 1765 (1994); Note, *From Watergate to Whitewater: Congressional Use Immunity and Its Impact on the Independent Counsel*, 83 Geo. L.J. 2385 (1995); *see also* Faye Jones, *Twenty-Five Years After Watergate: A Selective Bibliography*, 51 Hastings L.J. 793 (2000) (collecting Watergate resource material).

*the CIA* (1984) (accusing the CIA of masterminding the Watergate burglary). Indeed, the original Watergate exhibit at the Nixon Presidential Library and Museum portrayed President Nixon as the victim of a "coup" by his enemies. *See* Greenberg Decl. ¶ 8. The exhibit has since been overhauled. *See id.*

Various events have kept Watergate in the public eye. For example, Mr. Nixon's death in 1994 sparked increased discussion of the scandal and Mr. Nixon's role in it. *See* William E. Schmidt, *The 37th President: Watergate; Nixon's Darkest Chapter, by Those Who Lived It*, N.Y. Times, Apr. 26, 1994. And in 2005, former FBI Associate Director W. Mark Felt's revelation that he was "Deep Throat," the anonymous government source of information for *Washington Post* reporters Bob Woodward and Carl Bernstein, sparked additional discussion of Watergate. *See* John D. O'Connor, *I'm the Guy They Called Deep Throat*, Vanity Fair, July 2005; David Von Drehle, *FBI's No. 2 Was 'Deep Throat,'* Wash. Post, June 1, 2005 ("The identification is also likely to encourage new arguments about the essential meaning of Watergate . . . ."). Anniversaries of the Watergate break-in (June 17) and President Nixon's resignation (August 9) routinely inspire Watergate discussion. *See, e.g.*, Allen Barra, *Nixon Knows Best*, Salon, June 15, 2007 ("[J]ust in time to commemorate the 35th anniversary of the Watergate break-in, bookshelves are inundated with Nixon lit[erature]."); Nick Kovijanic, *The Unraveling of a Presidency: Nixon Insiders and Critics Alike Look Back at Watergate*, MSNBC.com, Aug. 8, 2004, http://www.msnbc.msn.com/id/ 5559637/ns/us_news-nixon_ anniversary. In addition, controversies over the past several years about executive power, separation of powers, and government leaks inevitably draw parallels to Watergate and Mr. Nixon's presidency. *See, e.g.*, Frank Rich, *Kiss This War Goodbye*, N.Y. Times, July 31, 2010; Daniel Ellsberg, *Truths Worth Telling*, N.Y. Times, Sept. 28, 2004; *see also* Andrew Rudalevige, *The New Imperial*

*Presidency: Renewing Presidential Power After Watergate* 5 (2005) ("The framework of presidential-congressional relations established in the wake of Watergate is critically important for understanding a wide range of current issues, from war powers to budgeting to government ethics to executive secrecy.").

Public perception about the former president has fluctuated in the years since the resignation. *See* Russ Witcher, *After Watergate: Nixon and the Newsweeklies* (2000) (providing a content analysis of coverage of Richard Nixon in *Newsweek*, *Time*, and *U.S. News & World Report* from President Nixon's resignation in August 1974 until his funeral in 1994). Yet ultimately, Mr. Nixon's legacy is tied to Watergate, and even now, "the whole Watergate affair is still given to different interpretations." Kovijanic, *The Unraveling of a Presidency*, *supra*; *see, e.g.*, Adam Nagourney, *Wategate Becomes Sore Point at Nixon Library*, N.Y. Times, Aug. 6, 2010 (discussing controversy over Watergate exhibit at Nixon Presidential Library).

The historians who provided declarations in support of this petition are leading and respected scholars of President Nixon and Watergate, and they attest to the ongoing historical interest in Watergate and the likelihood of valuable historical research that would result from the release of the records. *See, e.g.*, Perlstein Decl. ¶ 4 ("The issues on which Nixon testified on June 23 and 24, 1975, were among the most important in the annals of American law and politics, ansd indeed the annals of democratic republicanism itself."); Small Decl. ¶ 4 ("This story is too important in our nation's history to justify the withholding of this potentially important data from public purview, thirty-five years after the fact.); Olson Decl. ¶ 13 ("Watergate, finally, is part of the larger narrative of the post-World-War II 'imperial presidency.' Nixon's views of his powers, as he exercised them during Watergate, therefore have a broader importance."); Greenberg Decl. ¶ 10 ("Richard Nixon, for all

his prominence, was one of the most enigmatic public figures of the 20th century, and this testimony would shed light on the important question of who he was."); Long Decl. ¶ 5 ("The historical interest in Watergate has only grown over time."); Zelizer Decl. ¶ 3 ("The scandal had raised important questions about the balance of power between Congress and the president, with growing awareness of the problems that had resulted from the growth of presidential power throughout the twentieth century.").

*  *  *  *  *

Thus, the tremendous general historical interest in Watergate suffices to justify disclosure of the requested grand jury material. As the *New York Times* stated in discussing the importance of making the President's grand jury testimony public, "Even the memoirs of the leading participants, including Mr. Nixon, composed long after the heat has gone out of the controversy, cannot replace expert and minute cross-examination by persons knowledgeable in the details of the case." Editorial, *Mr. Nixon's Testimony*, N.Y. Times, *supra*. "[A] way should be found to make the testimony available to the public." *Id*. This petition is that way and should be granted.

**B.    Specific Historical Interest in President Nixon's Grand Jury Testimony**

The specific historical interest in President Nixon's grand jury records supplements the overwhelming general historical importance of the case and further justifies release of the requested records. In June and July, 1975, the historical importance of Mr. Nixon's grand jury testimony was not lost on the press. The *Washington Post* reported the news under a banner headline. *See* Sussman Decl., Attachment.  All three television networks reported the story on June 27. Helisek Decl. ¶ 7, and the major newspapers and magazines covered the story. *Id*. (citing examples). The testimony was

Mr. Nixon's *only* sworn oral testimony on Watergate and related matters and was the first time in history that a United States President had testified before a grand jury.[14] Perlstein Decl. ¶ 3.

According to the press accounts, Mr. Nixon's grand jury testimony addressed several topics of historical importance: (1) the 18½-minute gap; (2) alteration of White House transcripts; (3) misuse of the IRS; and (4) the Hughes-Rebozo payment. *See* Helisek Decl. ¶ 11 & Exh. 2. Each of these topics is critical to understanding Watergate. In addition, Mr. Nixon's testimony likely touched on other topics of historical importance. Mr. Nixon's sworn testimony will add greatly to existing knowledge, in the process creating a more accurate history and combating revisionism. *See supra* p. 27.

### 1.     18½-Minute Gap

Two enduring Watergate mysteries revolve around the 18½-minute gap in the tape-recorded conversation between President Nixon and Haldeman in the Executive Office Building on June 20, 1972. First, no account proves convincingly who was responsible for the erasures. During an evidentiary hearing before Judge Sirica, Nixon secretary Rose Mary Woods stated that she erased the tape accidentally. *See* Kutler Decl. ¶ 56. Her story has been met with skepticism in light of how the tape recording and playback mechanisms were operated. *See id.* ¶ 57; Hughes Decl. ¶ 6. Second, the content of President Nixon's and Haldeman's discussion during the 18½ minutes is not known. In his memoirs, Haldeman wrote that he and the President discussed the Watergate break-in. Specifically, Haldeman recalled discussing a "PR offensive" to counter any notion of Republican Party involvement. H.R. Haldeman, *The Haldeman Diaries* 473 (1994). Mr. Nixon wrote in his

---

[14]Mr. Nixon also gave brief written answers under oath to six questions posed to him by Judge Gerhard Gesell during the trial of John Ehrlichman. Timothy Robinson, *Nixon Testifies 11 Hours on Watergate: Talks to 2 Grand Jurors in California*, Wash. Post, June 28, 1975, at 1 (Attachment to Sussman Decl.).

memoirs that "[w]hat was said during the morning meeting will never be known completely." Richard Nixon, *The Memoirs of Richard Nixon* 631 (1978).

The 18½-minute gap received significant attention during the WSPF investigation. When Judge Sirica learned of the gap, he appointed a panel of six experts in acoustic and sound engineering approved by the White House and WSPF. *See* Kutler Decl. ¶ 57. The expert panel was asked to determine how the gap had been created, the type of machine that has been used to create it, and whether the erased tape could be restored. In its report, the panel noted that the 18½-minute portion of tape contained "buzz sounds but no discernible speech." *Id.* The report indicated that the experts had analyzed the tape thoroughly and concluded that "the buzzing sounds were put on the tape in the process of erasing and re-recording at least five, and perhaps as many as nine, contiguous segments." *Id.* (quoting Advisory Panel Report, Jan. 15, 1974, Ex. 145, *In re Grand Jury*, Misc. 47-73). The report stated that the panel was not able to recover the original conversation. *Id.* Judge Sirica referred the matter to the grand jury to further investigate the possibility of obstruction of justice. The grand jury reviewed evidence in the tape erasure matter and concluded that only a small number of individuals could have caused the erasures; the grand jury, however, was "unable to fix criminal responsibility on any particular individual or individuals." *Id.* ¶ 58 (quoting WSPF Final Report).

Interest in the 18½-minute gap was renewed in 2001 when the National Archives and Records Administration (NARA) published a solicitation in the Commerce Business Daily requesting proposals from contractors to participate in a project attempting to recover "intelligible speech" from the erased portion of the tape. NARA hoped that technological advances would allow experts in audio forensics to work with the recording to reconstruct the erased conversation. NARA allowed audio experts to work with test tapes to prove that they could examine the tapes without

causing damage. Two years of audio reconstruction efforts were unsuccessful, and no experts were permitted to work with the original. *Id.* ¶ 70 (citing NARA, *Feasibility of Recovering Erased Material from the 18½ Minute Gap in the Nixon Tapes*, Commerce Business Daily, Aug. 10, 2001).

More recently, in November 2009, NARA convened a forensic document examination team to study Haldeman's handwritten notes of the June 20, 1972, meeting. Haldeman's notes track the entire conversation, except for a gap that might correspond to the 18½ minutes of erasures. NARA began the process of reconstructing Haldeman's notes using electrostatic detection and other forensic techniques. That effort is ongoing, and it remains to be seen whether this latest effort to ascertain the contents of the erased 18½ minutes will be successful. *Id.* ¶ 71 (citing Press Release, National Archives and Records Administration, *National Archives Announces Plans to Test Haldeman White House Notes* (Nov. 18, 2009)).

Thus, significant historical interest—including interest of NARA, the nation's archivists—in the content of the 18½-minute gap and Mr. Nixon's knowledge of how it came to be remains strong.

### 2. Alteration of White House Transcripts

Months before the Supreme Court ordered President Nixon to comply with the tapes subpoena, the White House delivered transcripts to the House Judiciary Committee. *See* Kutler Decl. ¶ 61. The Committee had previously obtained some of the tapes of conversations included in the transcripts. Comparing the transcripts to the tapes, the House Judiciary Committee found that the transcripts provided to it contained inaccuracies.[15] *See* Impeachment of Richard M. Nixon, President

---

[15]The House Judiciary Committee published a comparison of White House and Judiciary Committee transcripts. *See* Hearings and Report of the House Judiciary Committee on Resolution to Impeach President Nixon (H. Res. 803), Comparison of White House and Judiciary Committee Transcripts of Eight Recorded Presidential Conversations, *available at*

of the United States: The Final Report of the House Judiciary Committee (HJC Final Report) at 292-96. According to the House Judiciary Committee's Final Report,

> Statements were omitted that were on the tape recordings; statements were added that were not on the recordings; statements were attributed to one speaker when they were made by another; statements were denominated as unintelligible when they were not; and statements were inaccurately transcribed, some in a manner that seriously misrepresented the substance and tone of the actual conversation.

*Id.* at 292-93. The White House also failed to explain the meaning of its oft-used notation, "Material Unrelated to Presidential Activities Deleted." *Id.* at 294.

The WSPF undertook a "full-scale investigation to determine whether various materials were deleted from the transcripts for the purpose of obstructing the Judiciary Committee's inquiry." WSPF Final Report at 54-55. It concluded that, despite "strong circumstantial evidence that at least some of the lengthy deletions were deliberate," it lacked evidence of criminal intent to bring charges in connection with the altered tape transcripts. *Id.* at 55.

Mr. Nixon's testimony may shed light on whether edits and omissions in White House transcripts were made intentionally (and if so, on whose order) and the extent to which President Nixon was involved in the decision to edit the transcripts.

### 3. Misuse of the IRS

The Nixon White House used the IRS to audit, investigate, and harass President Nixon's political opponents. *See* Kutler Decl. ¶¶ 13, 15. The WSPF did not file criminal charges against anyone in connection with the White House's misuse of the IRS because prosecutors decided that

---

(...continued)
http://www.maryferrell.org/mffweb/archive/viewer/showDoc.do?docId=144946.

they would not be able to prove the specific intent necessary to establish a violation of 18 U.S.C. § 371, conspiracy to defraud the United States. *See* WSPF Final Report at 66-67.

The grand jury questioned Mr. Nixon about the extent to which his White House used the IRS for improper purposes. Although much is known from journalists and historians about the IRS's Special Services Staff and its pursuit of numerous organizations and individuals, the public record is incomplete without Mr. Nixon's version of the facts.

### 4. Hughes-Rebozo Payment

The Senate Watergate Committee devoted considerable resources to investigating the Hughes-Rebozo payment. *See* Kutler Decl. ¶¶ 24-30. As the Committee's summary of the payment states, questions remain about why cash was given to Rebozo, rather than to any campaign official or organization, and why the money was contributed several years prior to the 1972 campaign for which it was allegedly intended, especially because Howard Hughes contributed $150,000 to the Finance Committee to Re-Elect the President in 1972, and whether Howard Hughes benefitted by giving the money to Rebozo, for the President. *See* Final Report of the Senate Watergate Committee at 1068.

After the Senate Watergate Committee issued its report in 1974, the WSPF continued investigating possible campaign contribution violations, income tax violations, and perjury arising from prior testimony. From April 1974 through July 1975, twenty-eight individuals testified before the grand jury about the Hughes-Rebozo payment. Also during that time, prosecutors issued hundreds of subpoenas for documents and interviewed more than one hundred people in connection with the investigation. *See* WSPF Final Report at 83. The WSPF concluded that the evidence it had marshaled would not support an indictment.

35

Mr. Nixon's grand jury testimony may reveal the extent of the President's knowledge about the Hughes-Rebozo payment. The testimony will help to answer the unanswered questions identified by the Senate Watergate Committee. *See also* Fulsom Decl. ¶ 5.

### 5. Unanticipated Issues Arising from Grand Jury Records

Although historians have access to a large amount of information on Watergate, the Nixon grand jury testimony may contain new and unanticipated information. The investigative grand jury process fosters an accumulation of information. Questioning is not limited by evidentiary rules of relevance, and grand jury witnesses are often asked broad, open-ended questions that encourage them to tell their stories. Thus, Mr. Nixon's grand jury testimony may reveal important historical information about the Nixon presidency that scholars and historians cannot predict. For example, in his book *The Price of Power*, Seymour Hersh wrote that, during his testimony, Mr. Nixon "shocked the lawyers" by "insisting that the United States had 'come close to nuclear war' during the India-Pakistan dispute. He said, one attorney recalled, that 'we had threatened to go to nuclear war with the Russians.'" Seymour Hersh, *The Price of Power* 457 (1983).

### III. The Need to Maintain Secrecy of President Nixon's Grand Jury Testimony Is Minimal.

Thirty-five years have elapsed since Richard Nixon testified before the grand jury. With grand jury records, age matters. Age diminishes the secrecy interests that can be legitimately invoked to justify the continued sealing of records.

During a grand jury investigation, the proceedings are kept secret to preserve the anonymity of grand jurors to enable uninhibited deliberations, protect grand jury witnesses from tampering, and avoid alerting suspects about the grand jury's investigation. *See Douglas Oil Co.*, 441 U.S. at 218-19; *Procter & Gamble Co.*, 356 U.S. at 681 n.6. When a grand jury investigation has ended, these

justifications immediately dissolve. *See Butterworth v. Smith*, 494 U.S. 624, 632-33 (1990). And when all appeals from convictions based on the grand jury's indictments have become final, the secrecy interest in protecting the grand jury witnesses from tampering or retaliation is diminished. *See Am. Historical Ass'n*, 49 F. Supp. 2d at 292.

In addition to the privacy interests that cease with the conclusion of the proceedings, *American Historical Association* identifies two secrecy interests that may remain years after a grand jury proceeding has ended: a general forward-looking interest in maintaining secrecy of grand jury proceedings to encourage future witnesses before other grand juries to testify without fear of reprisal and the specific privacy interest of any subjects of the investigation whose identities have not been revealed. *Id.* at 292. Here, as in the Hiss and Rosenberg cases, neither the general forward-looking interest in secrecy nor a specific interest in the secrecy of Mr. Nixon's testimony in particular is sufficient to overcome the historical interest in this landmark criminal investigation of government wrongdoing.

First, as previous courts have found, when a court orders the disclosure of decades-old grand jury records for historical purposes, the forward-looking interest in maintaining secrecy to protect the functioning of future grand juries is negligible. As time passes, "[t]he inhibiting effect of such disclosure is insignificant" when compared with other, more immediate causes of disclosure, such as press attention, statements by witnesses, and disclosures at trial. *Id.* In addition, in cases of historical importance, the "often extensive contemporaneous attention given to the case is likely to magnify the importance of those more proximate causes of disclosure in the minds of potential jurors and witnesses, and make the possibility of disclosure decades hence based on historical interest seem a trifling concern, or even an inevitability." *Id.*; *see* Davis Decl. ¶ 6 ("As a former prosecutor, I

understand and support the need to maintain grand jury secrecy. As time goes on, however, some of the key interests underlying the secrecy of grand jury proceedings diminish, particularly as those whose conduct may be referenced in these proceedings are deceased. ... Based on my experience as a prosecutor, I do not believe that disclosure of President Nixon's testimony and the related additional records requested would create the kind of precedent that would threaten the future functioning of the grand jury system."); Smock Decl. ¶ 8.

Grand jury material of comparable age to the material requested here has been released on the basis of historical interest without detriment to the forward-looking interest in grand jury record secrecy. *See In re Petition of May* (copy attached) (ordering release of 35-year-old records of William Remington's grand jury testimony in Hiss case). Similarly, the forward-looking secrecy interest in grand jury records has not been inhibited by the release of records in *American Historical Association, National Security Archive, Tabac,* or *O'Brien.* As in those cases, the age of the Nixon grand jury testimony mitigates any adverse effect that the release of the records might otherwise have on the functioning of future grand jury investigations.

Second, the discrete set of grand jury records sought by petitioners presents no threat to the privacy interests of the lone grand jury witness whose testimony is sought or to the principals of the Watergate scandal. Richard Nixon himself passed away in 1994. Many other Watergate principals, including those who likely were discussed at the grand jury, people connected to Mr. Nixon or his Administration, and people involved in conducting the investigations are also deceased: Alexander Haig (died Feb. 2010), Herbert Miller (died Nov. 2009), Bernard Barker (died July 2009), Donald Alexander (died Feb. 2009), W. Mark Felt (died Dec. 2008), E. Howard Hunt (died Jan. 2007), L. Patrick Gray (died July 2005), Peter Rodino (died May 2005), Rose Mary Woods (died Jan. 2005),

Fred LaRue (died July 2004), Archibald Cox (died May 2004), Samuel Dash (died May 2004), Ron Ziegler (died Feb. 2003), Richard Helms (died Oct. 2002), Herman Talmadge (died Mar. 2002), Vernon Walters (died Feb. 2002), James St. Clair (died Mar. 2001), Richard Kleindienst (died Feb. 2000), Elliot Richardson (died Dec. 1999), John Ehrlichman (died Feb. 1999), Charles "Bebe" Rebozo (died May 1998), Maurice Stans (died Apr. 1998), H.R. Haldeman (died Nov. 1993), John Connally (died June 1993), John J. Sirica (died Aug. 1992), Henry Petersen (died June 1991), John Mitchell (died Nov. 1988), Sam Ervin (died Apr. 1985), Leon Jaworski (died Dec. 1982), J. Fred Buzhardt (died Dec. 1978), Howard Hughes (died Apr. 1976), J. Edgar Hoover (died May 1972).

Of the remaining Watergate principals, most have little or no cognizable privacy interest in Richard Nixon's grand jury testimony. John Dean fully supports disclosure. *See* Dean Decl. ¶ 2. Most of the surviving principals have written about the events or given interviews, *see, e.g., supra* nn. 6-8, and so would be hard pressed to complain about disclosure of Mr. Nixon's version of events. Notably, aside from Mr. Nixon, each of the key figures and many less significant Watergate actors testified publicly under oath about Watergate. For example, the testimony of 122 people who appeared before the Senate Watergate Committee was published in June 1974 and remains easily accessible in the Committee's published report.[16] In addition, a great many others were questioned in open court in the trials of Hunt, Liddy, Mitchell, Haldeman, Ehrlichman, and others. *See A Guide to Watergate in Court* (Univ. Publ'ns of Am. 1975) (collecting transcripts of the four criminal trials, index available at http://www.lexisnexis.com/documents/academic/upa_cis/1951_WatergateinCourt. pdf). Yet Mr. Nixon's sworn testimony remains hidden from history.

---

[16]Available online at http://www.maryferrell.org/wiki/index.php/Watergate_Documents; available for purchase at http://www.amazon.com/Senate-Watergate-Report-Committee-Initiated /dp/0786717092.

Moreover, portions of the grand jury testimony of other people involved in Watergate have been revealed throughout the past thirty-five years, which greatly diminishes any interest in the secrecy of the records. *See In re Grand Jury Subpoena, Judith Miller*, 493 F.3d at 154; *In re Petition of May* (copy attached); *see also In re Motions of Dow Jones & Co.*, 142 F.3d 496, 505 (D.C. Cir. 1998) ("[W]hen information is sufficiently widely known . . . it has lost its character as Rule 6(e) material." (quoting *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994) (alteration in original))).

**A.** On or about March 26, 1973, three days after he had been sentenced to a prison term of not less than six years, eight months, G. Gordon Liddy was summoned to appear before the grand jury. Liddy was given compulsory immunity by the court so that he could testify before the grand jury regarding his involvement with the electronic surveillance of and burglary at the DNC headquarters, his meetings with others before and after the break-in, his knowledge of the involvement of others, and political surveillance more generally. Liddy invoked the privilege against self-incrimination and was held in civil contempt. His appeal of the contempt order was unsuccessful. In the course of litigating Liddy's claimed right not to testify, specific questions that had been asked of Liddy during his grand jury appearance were revealed. *See* Helisek Decl. ¶ 30.

**B.** In April 1973, in his *Washington Post* column, "The Washington Merry-Go-Round," Jack Anderson published a series of articles that excerpted verbatim grand jury testimony given by McCord, Hunt, Strachan, and Liddy's former secretaries Silvia Panarites and Sally Harmony. *Id.* Exh. 12; *see* Feldstein Decl. ¶ 9.

**C.** The following month, prosecutors informed Judge Matthew Byrne, Jr., the Los Angeles-based trial judge in the criminal case against Ellsberg, that they had learned that Hunt and Liddy had burgalized Dr. Fielding's office. Judge Byrne ordered that Hunt's testimony before the

Watergate grand jury be turned over to him. The court released Hunt's testimony, and the press published excerpts. Helisek Decl. Exhs. 13-15.

**D.** Watergate indictments charging the making of false statements before a grand jury contained excerpted grand jury testimony. *Id.* Exhs. 16-18.

**E.** Grand jury testimony was made public via the Judiciary Committee's impeachment hearings, including excerpted testimony of Dean, LaRue, Magruder, Gray, Ehrlichman, Haldeman, Kleindienst, Hunt, Krogh, Ziegler, Petersen, and Colson, among others. *Id.*

**F.** On March 1, 1974, the grand jury presented Judge Sirica with a sealed report and a cover letter recommending that he transmit the report to the House Judiciary Committee, which he did. *See id.* ¶¶ 21-22. The report was a fifty-five page "roadmap" containing "only a sentence or two on each of the pages. Each page was a reference to a piece of evidence—sentences from one of the tape recordings, quotations from grand jury testimony." James Doyle, *Not Above the Law: The Battles of Watergate Prosecutors Cox and Jaworski–A Behind-the-Scenes Account* 290 (1977). WSPF staff member Doyle described the roadmap as "a simple and unimpressive document, for it [was] narrow, declaratory, without conclusions." *Id.* His book describes some of the grand jury material.[17]

---

[17]Doyle described the grand jury report in this way:

One page might say, 'On March 16, 1973, E. Howard Hunt demanded $120,000.' Then it would list page references to grand jury testimony from witnesses who saw Hunt's blackmail note and references to the tapes where Hunt's demand was discussed. The grand jury transcripts and the tape transcripts would be included. The next page might say, 'On March 21, 1973, John Dean told President Nixon that Hunt had demanded $120,000, and that he estimated Hunt and the other Watergate defendants would 'cost' a million dollars in the next two years.' More grand jury and tape transcript page references. The next page might say, 'President Nixon
(continued...)

**G.** Mr. Nixon's testimony, as recalled by prosecutors who attended it, is recounted in Seymour Hersh's book, *The Price of Power*, as discussed above. *See supra* p. 34. The book also describes Mr. Nixon's testimony about Charles Radford, a White House staffer who had stolen classified documents for the Pentagon.[18]

**H.** President Nixon discussed his grand jury testimony in a 1977 interview with British television personality David Frost. Regarding the 18½-minute gap, Mr. Nixon told Frost that he testified under oath as to his noninvolvement and his belief in Rose Mary Woods' nonresponsibility for the erasures. Helisek Decl. ¶ 13. Similarly, Mr. Nixon's lawyer stated during oral argument before a special three-judge court in *Nixon v. Administrator of General Services*, Civ. A. No. 74-1852 (D.D.C. 1976), that Mr. Nixon had denied responsibility under oath for the 18½-minute gap. *See* Helisek Decl. ¶ 13.

---

[17](...continued)
responded, 'For Christ's sake, get it.'; and there would be further references to the tapes.

Doyle, *supra*, at 290-91.

[18]Hersh wrote:

> The prosecutors, trying to conclude their grand jury inquiries into presidential misconduct, had asked a series of questions about Yeoman Charles Radford. ... Nixon became extremely agitated when asked about Radford, one of the Watergate prosecutors recalls, and testified that "Radford knew everything. He was in all the sensitive meetings." Nixon went on, "We had these tough negotiations with China over the Mutual Defense Treaty [of 1961] with Japan. You have to be tough. And we told them that if they tried to jump Japan then we'll jump them." The Watergate prosecutor further remembers Nixon as testifying that "We told them that if you try to keep us from protecting the Japanese, we would let them go nuclear. And the Chinese said, 'We don't want that.'"

Hersh, *supra*, at 380.

*   *   *   *   *

In 1975, Watergate was a live political crisis and a very raw sore. Today, Watergate is history. Release of the testimony at issue cannot legitimately be said to threaten national stability or security. But it can further understanding of the events that shattered and forever changed the public's view of government, and contribute to scholarship aimed at deciphering the Watergate story and the constitutional questions that Watergate brought to the forefront and that have recurred since, without resolution. *See* Perlstein Decl. ¶ 12. Under the Second Circuit's test and the standards applied by district courts in other cases, the overwhelming general historical importance of Watergate and the specific historical interest in the President's grand jury testimony outweigh any remaining secrecy interests.

**CONCLUSION**

As demonstrated by the declarations submitted in support of the petition, all of the factors set forth in *Craig* and applied in *American Historical Association* support disclosure of President Richard Nixon's grand jury testimony and associated materials of the Watergate Special Prosecution Force. In the special circumstances presented here, petitioners request that this Court order release of these grand jury records.

Dated: September 8, 2010

Respectfully submitted,

Allison M. Zieve (DC Bar No. 424786)
Michael T. Kirkpatrick (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Counsel for Petitioners

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
IN RE  PETITION OF GARY MAY FOR AN
ORDER DIRECTING RELEASE OF GRAND JURY
MINUTES

MEMORANDUM & ORDER

M 11-189

----------------------------------------X

APPEARANCES

For Petitioner:        ANDREW J. LEVANDER, ESQ.
                       Shereff Friedman Hoffman & Goodman
                       919 Third Avenue
                       New York, New York   10022

                       PATTI A. GOLDMAN, ESQ.
                       ALAN B. MORRISON, ESQ.
                       CORNISH F. HITCHCOCK, ESQ.
                       Public Citizen Litigation Group
                       Suite 700
                       2000 P Street, N.W.
                       Washington, D.C.


For The Government: DAVID W. DENTON, ESQ.
                       Executive Assistant
                       United States Attorney

**WHITMAN KNAPP, D. J.**

Gary May, an associate professor of history at the University of Delaware, petitions for an order releasing the minutes of the Special Federal Grand Jury sitting from December 16, 1948 through June 15, 1950 that pertain to William Walter Remington. Professor May is writing a book about Remington, a prominent public official who was accused during the McCarthy era of being a Communist. The Government opposes May's petition.

It is clear that petitioner's request does not fall within the legislatively defined exceptions of Fed. R. Crim. P. 6(e). It has, however, been established in this circuit that in an extraordinary case the court need not confine itself to the strictures of Rule 6(e), but may exercise its discretion to permit disclosure. In Re Biaggi (2d Cir. 1973) 478 F.2d 489.

Five objectives for maintaining grand jury secrecy have been identified by the Supreme Court:

> 1) To prevent the escape of those whose indictment may be contemplated; 2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; 3) to prevent subornation of

2

> perjury or tampering with the witnesses who may testify before the grand jury and later appear at the trial of those indicted by it; 4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; 5) to protect the innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

United States v. Procter and Gamble Co. (1958) 356 U.S. 677, 681-82, n.6, quoting United States v. Rose (3d Cir. 1954) 215 F.2d 617, 628-29.

None of those objectives has the remotest application to the situation at bar. The events which occurred in and were explored by the grand jury happened over 35 years ago, and the trial has similarly long since concluded. The principals involved in the grand jury proceedings are all dead, with the exception of Remington's former wife, who has already been interviewed by Professor May. Moreover, there has been extensive prior disclosure of the grand jury proceedings. The only possible interest involved here is the policy of encouraging free disclosures by persons who have information with respect to the commission of crimes. Given the circumstances just described, we do not believe that permitting disclosure of the minutes will deter individuals

with information helpful to future grand juries from coming forward [1/]

In determining whether to disclose grand jury materials, we must balance the public interest in disclosure against the interest in continued grand jury secrecy. Douglas Oil Co. of California v. Petrol Stops Northwest (1979) 441 U.S. 211, 223. In the circumstances of this case, we find a considerable public interest in disclosure and no interest in secrecy. Given the alleged abuses of the grand jury which have been the subject of published decisions by our Court of Appeals, United States v. Remington (2d Cir. 1953) 208 F.2d 567, cert. denied 347 U.S. 913 (1954); United States v. Remington (2d Cir. 1951) 191 F.2d 246, cert. denied 343 U.S. 907 (1952) (Black, J. and Douglas, J. dissenting from denial of certiorari), and the undisputed historical significance of the Remington episode, the public has a strong interest in having its understanding of the administration of justice in this case based on complete and accurate historical evidence. [2/]

---

1/  At oral argument, the government did not dispute our suggestion that no witness would have been deterred from testifying had he or she been informed that the grand jury minutes might be disclosed after the passage of 35 years.

2/  The situation is quite different from the one presented in Hiss v. Department of Justice (S.D.N.Y. 1977) 441 F. Supp. 69. There, the defendant in a criminal case was seeking to use the Freedom of Information Act to obtain discovery not available under the Federal Rules of Criminal Procedure, and the count was apprehensive of establishing a "mischievous precedent," id. at 71. No such risk is presented by the situation at bar.

4

In the exercise of our discretion, we grant the petition. Entry of this Order is stayed for 15 days to permit the Government to appeal. However, the Government's application for a further stay is denied.

SO ORDERED.

DATED:    New York, New York
          January 20, 1987


_____
WHITMAN KNAPP, U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

IN RE PETITION OF GARY MAY FOR        :        AMENDED ORDER
AN ORDER DIRECTING RELEASE OF
GRAND JURY MINUTES                    :        M 11-189
                                               M 11-188
- - - - - - - - - - - - - - - - - -x

     Upon the consent of the parties, this Court's Memorandum
and Order dated January 20, 1987 is hereby amended as follows:

     1. Within 90 days of the date the parties affix their
agreement and consent to this order, the United States Attorney's
Office shall provide to Petitioner one copy, without charge, of
the minutes of the Special Federal Grand Jury convened from
December 16, 1948 to June 15, 1950, insofar as those minutes
pertain to the investigation of William Walter Remington. If
petitioner desires additional copies of the minutes, the United
States Attorney's Office will provide such additional copies at
20¢ per page.

     2. The United States Attorney may redact such
portions of the minutes as would be subject to exemption from
disclosure under the Freedom of Information Act ("the Act"), 5
U.S.C. § 552(b). The United States Attorney shall not, however,
rely on Rule 6(e), Federal Rules of Criminal Procedure, as a basis
for redaction, nor shall the United States Attorney rely on
exemption 3 of the Act, 5 U.S.C. § 552(b)(3), insofar as
exemption 3 incorporates Rule 6(e). In the event any redactions

are made, the United States ⟨...⟩                    ⟨...⟩ petitioner
an index of the redactions, including reference
relied upon, in accordance with the procedures set forth in
Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415
U.S. 977 (1974).

   3.   The parties shall thereafter endeavor in good
faith to resolve any issues concerning the applicability of such
exemptions.  In the event any issues concerning the applicability
of such exemptions remain unresolved by the parties, any such
issues may be presented to the Court for resolution consistent
with the principles and procedures for determining the
applicability of exemptions claimed under 5 U.S.C. § 552(b) and
caselaw thereunder.  The Court will retain jurisdiction for such
purposes.

   4.   In the event the United States Attorney requests
that the Court withdraw its prior Memorandum and Order in this
matter from publication in the Federal Supplement, petitioner
agrees to take no position on such request.

   5.   It is understood that petitioner may apply for
an award of costs and attorneys fees and expenses under the Equal
Access to Justice Act, 28 U.S.C. § 2412, and it is understood
that the Government may oppose such application.  In the event
such application is made, petitioner agrees to seek no more than
$20,000 total in costs, attorneys fees and expenses, for any
services performed up to and including the date the parties affix
their agreement and consent to this order.

6.   The United States attorney agrees to move in the Court of Appeals for dismissal of its appeal in this matter with prejudice.

Dated:   New York, New York

April 17, 1987

SO ORDERED:

_____
UNITED STATES DISTRICT JUDGE

AGREED AND CONSENTED TO:

_____          April 7 , 1987
DAVID W. DENTON
Executive Assistant United States
    Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY  10007
Telephone: (212) 791-1955
Attorney for the United States
    of America


_____          April 2 , 1987
PATTI GOLDMAN
Public Citizen Litigation Group
2000 P Street, N.W.
Washington, D.C.  20036
Telephone: (202) 785-3704
Attorney for Petitioner


_____          April 3 , 1987
ANDREW J. LEVANDER
Shereff Friedman Hoffman & Goodman
919 Third Avenue
New York, NY  10022
Telephone: (212) 758-9500
Attorney for Petitioner

- 3 -